Receipt number 9998-4372909

FILED
Dec 18 2017
U.S. COURT OF
FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PLANATE MANAGEMENT GROUP, LLC : | |
| : | |
| Plaintiff, : | CASE NO. 17-1968 C |
| v. : | |
| : | |
| THE UNITED STATES OF AMERICA, : | |
| : | |
| Defendant. : | |

# COMPLAINT

Plaintiff Planate Management Group, LLC ("Plaintiff" or "Planate"), by the undersigned counsel, for its Complaint against the United States alleges as follows:

## PARTIES AND UNDERLYING CONTRACT

1. Planate is a Virginia corporation and a federal contractor, with its principal place of business located at 3631 Ransom Place, Alexandria, Virginia 22306.

2. Defendant is the United States of America ("Defendant"), acting by and through the U.S. Department of the Army ("DOA") – Army Expeditionary Contracting Command-Afghanistan, 925th Contracting BN & RCC Afghanistan, Bagram Air Field, Afghanistan, APO AE, 09354.

3. This dispute arises from a contract entered into between Planate and the DOA under contract number W91B4M-11-P-4342 (hereinafter the "Contract"). A copy of the Contract is attached hereto as **Exhibit 1**.

## JURISDICTION

4. The Court has jurisdiction over this matter pursuant to 28 U.S.C. 1491 and the Contract Disputes Act of 1978, ("CDA"), 41 U.S.C. § 601, et seq. This action is a timely appeal pursuant to the CDA of a Contracting Officer's final decision dated August 1, 2016.

5. The Contracting Officer's final decision was not received by Planate until December 20, 2016 due to an internal administrative error at the DOA. (*See* **Exhibit 2**)

6. Planate commenced this Action within 12 months from the date of receiving the Contracting Officer's final decision.

## FACTS

7. On or about April 3, 2011, Planate was awarded Contract Number W91B4M-11-P-4342 to provide personnel, equipment, tools, materials, supervision, and other items and non-personal services to perform support services in support of the Afghan Air Force ("AAF") Development Services, outlined in the Performance Work Statement ("PWS" or "Work").

8. The Work was directed by the USAF 438th Air Expeditionary Wing ("438 AEW") Civil Engineering Director located in Kabul, Afghanistan.

9. The objective of the Work was to increase 438 AEW capability to technically manage development of the Afghanistan Air Force communications and infrastructure. (*See*, **Exhibit 1**, p. 53 of 62).

10. The Contract required Planate to provide services from professional personnel, including engineer planners, real estate managers, fire protection planners, project managers and a communications director. The professional services included advising, coordinating, and supporting the United States Air Force ("USAF") and AAF regarding infrastructure built across numerous locations in Afghanistan.

11. Under the initial Contract, Planate personnel were not required nor allowed to carry weapons for their own personal security and protection. The USAF provided for Planate's physical security and protection and directed force protection matters pursuant to directives issued by military commanders. (*See* **Exhibit 1**, p. 46 of 62).

12.  A few weeks after the Contract was awarded, a terrorist attack occurred within the secure working location. On April 27, 2011, an Afghan Army Officer shot and killed 8 American military officers of the 438th AEW and one contractor within the secure work location. The Afghan Army Officer responsible for the slayings had been radicalized, unbeknownst to the AAF or the USAF. The terrorist attack made national and international news.

13.  This unexpected "insider" attack from a member of the AAF/USAF-Coalition proved to be the first of many. According to April 30, 2013 Special Inspector General for Afghanistan Reconstruction (SIGAR) Quarterly Report to the United States Congress (*See*, p. 85, available at https://www.sigar.mil/pdf/quarterlyreports/2013-04-30qr.pdf), "[t]he number of insider attacks (Afghans in uniform attacking their Coalition partners) has been on the rise, from two attacks in 2008 to 46 attacks in 2012. The 2012 attacks resulted in 62 Coalition deaths, 35 of them U.S. personnel. Several of these attacks occurred in Kabul, Kandahar, Jalalabad and Herat – each of these are locations Planate's personnel routinely visited to conduct work in support of the Contract.

14.  This tragedy caused the USAF to dramatically change its security posture within the working environment. On May 14, 2011, the 438th AEW, through the Department of Defense ("DoD"), issued a Force Protection Directive outlining significant security changes "due to increasing threats and recent events[.]" (*See* **Exhibit 3**). The Force Protection Directive changes included a mandatory "two-person rule" at all times on the Afghan compound. The "two-person rule" required all individuals (including Planate personnel) to travel with an armed "wingman" for protection at all times.

15.  Another Force Protection Directive was issued September 10, 2011. This new Directive reiterated the mandatory "two-person rule" and outlined other new safety protection

measures. The Directive stated that "at no time will unarmed contractors remain on AAF bases or installations once all armed personnel have departed for the day." (*See* **Exhibit 4**) This Directive defined the two-person rule as "two individuals armed with one in Weapon State RED, as a minimum "and "the two-person rule is mandatory anywhere outside of a secured coalition compound." (*See* **Exhibit 4**)

16. Planate personnel were required to travel daily outside the US/Coalition-controlled areas. Movement outside the US/Coalition-controlled areas exposed Plaintiff's personnel to improvised explosive devices, vehicle-borne improvised explosive devices, personnel-borne explosive devices, and hostile small arms fire. In the event aircraft and/or vehicles in which they were traveling were shot down or disabled, they were required to assist with their defense.

17. Planate contractors also accompanied the 438th AEW Civil Engineer on visits to forward operating locations including Shindand, Kandahar and Mazar-e-Sharif as well as other locations. However, there were occasions where Plaintiff's personnel traveled to these locations unaccompanied at the direction of 438th AEW leadership. Given the mandatory directive to travel with a "wingman" at all times, it became manifestly unreasonable for Planate contractors to be unarmed for personal protection.

18. Additionally, according to the 438th AEW Civil Engineer, military facilities in the Kabul area were arranged in such a way that getting from the US-controlled housing area to their assigned work location involved approximately a 1.5 mile (2.4 km) commute either on foot or in a vehicle. Because of the nature of their job, Planate's contractors could not have US/Coalition military/security personnel with them at all times.

19. Because Planate personnel were required to travel alone, without personal protection, with an increasing threat of terrorist attacks, it became apparent to Planate as well as the Defendant that Planate's personnel must be armed for their own safety.

20. To make matters worse, starting in 2012, the 438th AEW experienced significant decreases in the number of personnel available for security to watch both the AAF side of Kabul International Airport as well as outlying bases where Plaintiff's personnel traveled for site assessments in support of the 438th AEW mission. This greatly reduced the amount of military personnel available to provide security to contractor personnel.

21. The deteriorating security situation threatened the success of USAF's mission. There was no question that the maintenance of the 438th AEW two-person integrity directive would improve with the support of Plaintiff's personnel having weapons and that this would benefit the USAF by allowing it to use its personnel for tasks other than providing security for a contractor.

22. Following the terrorist attack within the "secure" working environment, the increased security requirements, and the orders to travel outside of coalition-protected areas alone, Planate personnel became afraid for their lives. Regardless of these changes, Planate was still required to continue performance under the Contract.

23. It became apparent to Planate as well as the Defendant that Planate personnel should carry weapons for personal protection and were required to do so by the Force Protection Directives. In 2011, Planate management spent several months working with the Contracting Officer's team to get their personnel firearms for personal protection.

24. On November 01, 2011, USAF Colonel Bryan C. Bartlett, Vice Commander of 438th AEW, issued a Memorandum (copy attached hereto as **Exhibit 5**), requesting

authorization to allow Planate's personnel to carry firearms for personal protection. Paragraph 3 of the memorandum states, in part:

> "[T]raveling outside US/Coalition controlled areas is a daily occurrence for getting from the living quarters to work locations. There are also opportunities to travel to forward operating areas within Afghanistan as part of their duties. Movement outside the US/Coalition controlled areas expose these individuals to improvised explosive devices (IEDs), vehicle-borne improved explosive devices (VBIEDs), personnel-borne explosive devices (PBIEDs), and potentially hostile small arms (SMARMS) fire. In the event aircraft and/or vehicles in which they are travelling are shot down or disabled, they will be required to assist with their defense."

25.  The memorandum also explained that "civilian project managers previously posted in similar positions have been similarly armed due to the potential to travel outside the US/Coalition controlled areas." Additionally, "because of the nature of their job, Planate staff may not have US/Coalition military/security personnel with them at all times. The Kabul and outlying areas have seen an increase in violent attacks in 2011 and the prediction is for this trend to continue to increase." This memorandum clearly recognized the change in security availability, requirements, and duties of Planate personnel. Indeed, to not have security or military personnel accompanying contractors at all times outside of the secure working area was in direct contravention to the Force Protective Directives.

26.  The authorization for Planate personnel to carry weapons for personal security was approved. Because Planate contractors were not previously authorized to carry weapons for personal protection, a modification to the initial Contract was issued on April 5, 2012. (*See* **Exhibit 6**).

27.  The modification amended clause 952.225-0011 "Government Furnished Contractor Support" to require the Government to provide the contractor "authorized weapon[s]" on an "as-available" basis. (*See* **Exhibit 6, p. 7 of 7**).

28. The 438th AEW was unable to loan weapons to Planate personnel because all members of the 438th AEW were provided weapons from their home unit. Local U.S. security forces likewise did not have weapons to loan. Upon information and belief, the Contracting Officer was aware of these facts when negotiating with Planate, and throughout the Contract modification process.

29. Planate spent many months in discussion with the Defendant prior to the Contract modification. Planate understood the Defendant was requiring Planate personnel to be armed for personal protection given the drastic change in security posture (i.e. increased threat level)/working environment and requirements (i.e. traveling alone), and would reimburse Planate for the costs of the personal protection weapons.

30. Based on the Defendant's assurances, Planate signed the Contract modification on May 7, 2012 and awaited separate documents to sign for reimbursement of the self-protection weapons. (*See* **Exhibit 7**) Contrary to assurances, negotiations, and preparations, the Contracting Officer later notified Planate that they would not be reimbursed. Despite dramatic changes in security requirements, the working environment, and Defendant's reduction in security personnel, Planate was then required to bear the entire cost of arming itself for personal protection.

31. Immediately after signing the modification to the Contract authorizing Planate contractors to have weapons, Planate contacted Lieutenant Colonel USAF Tay W. Johannes, AETC AFIT/ENV regarding his recollections of the discussions with 438th AEW leadership about their request for Planate's personnel to be armed (email is attached hereto as **Exhibit 8**). On May 9, 2012 Lieutenant Colonel Johannes replied that he had a similar recollection of the Defendant's request. (email is attached hereto as **Exhibit 9**).

32.     In order to address the fears of Planate's personnel in Afghanistan, Planate President, Christian Decker, traveled to Afghanistan in June 2012, met with the Contracting Officer and discussed the Contract and modification. Based on the discussions with Contracting Officer, Mr. Decker believed that she would follow through with the initial agreement and negotiate a modification to the Contract regarding provision of weapons to Plaintiff's personnel to allow Planate to be reimbursed for the costs. (emails of the Plaintiff are attached hereto as **Exhibit 10**).

33.     After not receiving any update for months, Planate sent several letters of justification for modification to Contract allowing reimbursement allowances (Request for Equitable Adjustment or "REA") (attached hereto as **Exhibits 11, 12, 13, 14**) to the Contracting Officer. The REA contained the request of reimbursement in the amount of US $84,864.85 through execution of a modification to the Contract, and was based on the change in security posture post-award of the Contract, due to which the Plaintiff had to self-finance expenses supporting personal protection of the personnel working on the Contract.

34.     On July 6, 2016 the Plaintiff sent a Request for Final Contracting Officer's Decision (COFD) under Contract to the Contracting Officer, Lieutenant Colonel Wyeth S. Anderson (the "RFCOD", attached hereto as **Exhibit 14**), seeking reimbursement in the amount of $84,864.85 and providing a calculation of the sum of reimbursement and cost narrative.

35.     On August 1, 2016 the Contracting Officer issued a final decision in response to the RFCOD (copy attached hereto as **Exhibit 15**), denying the claims stated in the RFCOD.

36.     The final decision was not sent to the Plaintiff until December 20, 2016 due to an internal administrative error by the Defendant. (attached hereto as **Exhibit 2**). Therefore, the date

of receipt of the final decision by the Plaintiff is December 20, 2016, and the Plaintiff submits this claim within 12 months from such date.

## COUNT I - DISPUTE UNDER THE CONTRACT: APPEAL OF FINAL DECISION

37. Planate realleges and incorporates by reference the allegations in paragraphs 1 through 36 above.

38. Planate fully and competently performed the Work required under the Contract and has complied with all prerequisites and/or conditions precedent for the filing of this action.

39. Under the terms of the Contract, Planate is entitled to payment for any changes in the Work scope or means or methods of performance and is further entitled to an equitable adjustment for the cost of such changes, including, without limitation, costs expended.

40. The Defendant failed to provide such compensation for the changes, both directed and constructive, and for such changes in condition, means and methods of performance.

41. The Defendant failed to properly adjust the Contract for such changes and failed to negotiate such changes and impacts in accordance with the Contract and its terms incorporated by reference.

42. As a result of such contractual failures, Planate has been damaged in the amount of $84,864.85 and seeks a Contract adjustment of that amount.

43. At this point, the Defendant has not allowed any payments or Contract adjustment on this requested amount, and has denied the entirety of the amount requested.

44. Moreover, the Defendant advised Planate of its right to appeal its Final Decision.

45. Planate seeks the adjustment requested in this Count as an alternative pleading to the amount sought in Counts II-V.

46. The Contracting Officer's Final Decision rejecting the reimbursement should be overruled and judgment should be entered in Planate's favor because the Contracting Officer's decision was unreasonable, an abuse of discretion, and/or not in accordance with the terms of the Contract and the relevant law and facts.

## COUNT II - BREACH OF CONTRACT

47. Planate incorporates herein by reference the allegations contained in 1 through 46 above.

48. Planate fully and competently performed the Work required under the Contract and has complied with all prerequisites and/or conditions precedent for the filing of this action.

49. Under the terms of the Contract, Planate is entitled to payment for any changes in the work scope or means or methods of performance and government-furnished services and equipment and is further entitled to an equitable adjustment for the cost of such changes including, without limitation, costs expended.

50. The Defendant delayed in engaging in adjustments for the Contract modification to place Planate under economic duress in order to improve the Defendant's bargaining position.

51. The Defendant failed to provide compensation for such changes, both directed and constructive, and for such changes in conditions, means and methods of performance, and schedule.

52. In doing so, the Defendant breached the Contract, including without limitation the Changes clause of the Contract, and breached its obligation under the Federal Acquisition Regulations relating to contract performance and settling changes.

53. As a result of such breaches and contractual failures, Planate has been damaged in the amounts set forth in the REA and has been further damaged in losing the time value of

money that it was owed and in having to expend significant amounts of legal and administrative costs to pursue this action.

54. Accordingly, Planate seeks damages for breach of contract in the amount of $84,864.85 which includes the amounts as set forth in the calculation under the REA.

55. Planate seeks the adjustment requested in this Count as an alternative pleading in the amounts sought in Counts I, III, IV, and V.

## COUNT III - BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

56. Planate incorporates herein by reference the allegations contained in 1 through 55 above.

57. The Defendant had an obligation to render reasonable cooperation to Planate in the performance of the Contract, as well as an obligation not to unreasonably hinder Contract performance.

58. The Defendant breached its obligation of good faith and fair dealing by requiring Planate to arm its personnel for personal protection and then failing to reimburse for the costs of such personal protection.

59. The Defendant breached its obligation of good faith and fair dealing by requiring Planate to arm its personnel and subsequently refusing to compensate Planate for the costs, delays, and inefficiencies associated with the Defendant's unreasonable administration of the Contract modification.

60. As a result of the Defendant's breach of its obligations of good faith and fair dealing, Planate is entitled to recover damages not less than $84,864.85.

61. Planate seeks the adjustment requested in this Count as an alternative pleading to the amount sought in Counts I, II, IV and V.

## COUNT IV - CONSTRUCTIVE CHANGE

62. Planate incorporates herein by reference the allegations contained in 1 through 61 above.

63. The increased security threat, the lack of government-supported security, the subsequent Force Directives issued, and the administration of the Contract modification, drastically impacted Planate's performance of the Contract, requiring Planate to perform the Contract in a more expensive manner than contemplated at the time of initial contracting.

64. The Defendant was provided repeated notice regarding the costs of the modification and impact upon performance of the Work. The Defendant failed to take any action to resolve the problems caused by the change in security posture and working environment. Instead, the Defendant placed the entire financial burden on Planate.

65. Planate seeks the adjustment requested in this Count as an alternative pleading to the amount sought in Counts I, II, III and V.

## COUNT V - CARDINAL CHANGE

66. Planate incorporates herein by reference the allegations contained in 1 through 65 above.

67. Planate fully and competently performed the Work required under the Contract and has complied with all prerequisites and/or conditions precedent for the filing of this action.

68. The change in security posture, change in working environment (i.e. requiring Planate personnel to travel alone after reducing the amount of government-provided security personnel) were outside the scope of the original agreement and Contract.

69. The USAF-directed changes to the Contract significantly changed the security posture, working environment, and thus the costs associated with security.

70. Such changes directed by the Defendant were beyond the scope of the contract and fundamentally altered Planate's contractual undertaking.

71. As a result of those changes, the cost of work performed was drastically changed from the cost of work Planate bid to perform and constituted a cardinal change.

72. Accordingly, Planate seeks damages for breach of contract in the amount of $84,864.85 which includes the amounts as set forth in the calculation under the REA. as the evidence in this case may indicate.

73. Planate seeks the adjustment requested in this Count as an alternative pleading to the amounts sought in Counts I-IV herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Planate, requests that this Honorable Court grant Judgment in favor of Plaintiff and against the Defendant as follows:

A. In the amount of $84,864.85 or in such other amount as the evidence in this case may indicate, for the Defendant's failure to equitably adjust the Contract as required by its terms as calculated under the calculations under count I; or

B. Alternatively, and in lieu of the amount requested in Prayer for Relief A above, in the amount of $84,864.85 or in such other amount as the evidence in this case may indicate, for the Defendant's failure to equitably adjust the Contract as required under the theory of Count II; or

C. Alternatively, and in lieu of the amount requested in Prayer for Relief A or B above, in the amount of $84,864.85 or in such other amount as the evidence in this case may indicate, for the Defendant's breach of its contractual obligations to equitably adjust

the Contract as set forth in Count III, or for its breach of duties as set forth in Counts IV-V.

D. Attorney's fees and court costs to the extent permitted under any applicable legal theory, the Contract, statute, or regulation, and

E. Post judgment and prejudgment interest as permitted under any applicable legal theory, the Contract, statute or regulation, including without limitation the Contract Disputes Act; and

F. Such other and further relief as the Court may deem just and appropriate.

                      Respectfully submitted,

December 18, 2017              By: /s/ Ryan C. Berry

                      _____
                      Ryan C. Berry
                      WARD & BERRY PLLC
                      2020 N Street, NW
                      Washington, DC 20036
                      (202) 331-8160
                      (202) 331-8162 (Fax)
                      ryan@wardberry.com