**EXHIBIT 14**

**COPY OF PLAINITFF'S REQUEST FOR FINAL
CONTRACTING OFFICER'S DECISION (COFD),
JULY 6, 2016**



**PLANATE**
MANAGEMENT GROUP

6 July 2016

Certified Mail
LTC WYETH S. ANDERSON
CCEC-ECC-A-RCC-CAPITAL
U.S. Army Expeditionary Contracting Command-Afghanistan
925th Contracting BN & RCC Capital
New Kabul Compound APO AE, 09354

SUBJECT: Request for Final Contracting Officer's Final Decision (COFD) under Contract No. W91B4M-11-P-4342

Dear LTC Anderson:

By letter dated 23 October 2015 you denied Planate Management Group (PMG) Request for an Equitable Adjustment associated with arming PMG employees for self-defense. PMG has reviewed the entire situation and files this request for a COFD.

Following contract award (April 2011), and throughout PMG's first year of contract performance, the 438th AEW and the U.S. Air Force addressed security issues within Afghanistan. At no time prior to award did either PMG or the Contracting Officer contemplate or even discuss the need for PMG personnel to be armed.

As a result of several internal attacks on 438th AEW personnel, in July 2012, over a year after contract performance commenced, the 438th AEW issued a force protection directive stipulating the "two-person rule" where no active duty nor contractor personnel could travel to unsecured work locations without proper protection. When originally directed, active duty personnel from the Air Force provided this protection. As the number of active duty personnel was reduced, contractors had to rely on their own personnel for protection to comply with the new force protection directives. PMG worked with the 438th AEW to comply with the process for bringing arms to Kabul. The change in security situation required the government to alter PMG's performance with regard to protection and was absolutely not contemplated by either party at time of award.

PMG is entitled to compensation for its costs under this "changed" requirement. Furthermore, the facts in this case clearly meet all the elements and constitute a mutual mistake. Both Gov't & Contractor were mistaken about a basic assumption that had a material effect on performance of the contract and did not involve a risk that the contractor expressly assumed.

Both the changes in security posture made subsequent to award and the facts and evidence, which show a clear mutual mistake between the contracting parties, entitles PMG to be compensated. My point of contact is Jonathan Larson (Jonathan.Larson@planate.net / 703-585-1079).

Respectfully,

Chris C. Decker
President

1 | 3631 Ransom Place            Tel: (703) 585-1079        www.planate.net
    Alexandria VA 22306           Fax : (866) 844-4373      chris.decker@planate.net



Planate Management Group LLC hereby submits its claim under the Contracts Disputes Act for an uncompensated change to its contract W91B4M-11-P-4342. The basis of the claim is direction from the Contracting Officer Representative that Planate provide armed security for its personnel in response to rapidly deteriorating security conditions within the contract performance locations.

On 03 April 2011, Planate Management Group LLC received award of contract W91B4M-11-P-4342. This was a Purchase Order to "… to perform support services in support of the Afghan Air Force (AAF) Development Services …." The objective of the Purchase Order was for embedded contractor personnel to increase or enhance the capabilities of the US Air Force 438th Air Expeditionary Wing to technically manage development of the Afghan Air Force communications and infrastructure. By its very nature, this contract involved interaction with both US and Afghan military.

The initial contract performance period was 06 April 2011 through 05 April 2012 with four (4) additional option years. The government exercised Option Years 1 through 4. This claim addresses the initial performance period and all Option Years.

The contract is a "Commercial Items" contract under FAR Part 12 and includes FAR Clause 52.212-4c(Changes) and DFARS Clause 252.225-7040 "Contractor Personnel Authorized to Accompany U.S. Forces Deployed Outside the United States." Under Clause 252.225-7040 as originally implemented in Planate's contract, Planate personnel were not permitted to carry weapons; accordingly, Planate's offered price did not include any costs associated with acquiring, transporting, using and managing weapons.

In May 2011, Planate personnel met with the Contracting Officer's Representative, LTCol Tay Johannes in Washington D.C. for a kick-off meeting. At the meeting LtCol Johannes informed Planate that due to a very recent incident, the security conditions within the contract performance locations had significantly deteriorated and that a change in the security posture for the 438th AEW and its support contractors would soon be published. LtCol Johannes indicated that Planate was required to comply with any changes in security requirements. Planate representatives understood this to mean that any change would be a contract change in performance directed by the Contracting Officer's Representative.

The deteriorating security conditions that LtCol referred to was an internal attack on 27 April 2011, 24 days after contract award. During a routine meeting between members of the 438th AEW and Afghan Air Force personnel, an AAF Officer opened fire, killing eight 438th AEW Airmen and one US civilian support contractor. Several other personnel, US and Afghan, were injured.

Prior to contract award, the security posture between US forces and Afghan Forces could be described as a cooperative partnership. In August 2010, both the United States and the Afghan government issued major directives to emphasize this partnership. On August 1, 2010, General David Petraeus, Commander, U.S. Forces Afghanistan (USFOR-A), issued Tactical Directive 2010-08-CA-004 which stated in part:



> *. ... Partnering is how we operate. Some civilian casualties result from a misunderstanding or ignorance of local customs and behaviors. No individuals are more attuned to the Afghan culture than our Afghan partners. Accordingly, it is essential that all operations be partnered with an ANSF unit and that our Afghan partners be part of the planning and execution phases. Their presence will ensure greater situational awareness. It will also serve to alleviate anxiety on the part of the local population and build confidence in Afghan security forces.*
>
> I expect every operation and patrol to be partnered.

Similarly, on August 17, 2010, Afghan President Hamid Karzai issued a Decree banning foreign Private Security Companies. This decree was followed by the establishment of the Afghan Public Protection Force, an Afghan government entity which was to serve as the sole provider of contracted security services within Afghanistan.

The nature of the partnership between the 438the AEW and the Afghan Air Force personnel it supported dramatically changed when the AAF Officer's began shooting on 27 April 2011. This resulted in the change in security posture referenced by the Contracting Officer's Representative.

The change in security posture reflected a changing perception of the true risks associated with performance of Planate's contract. Accordingly, at a performance start up meeting between Planate personnel and the 438th AEW Chief of Staff, Col Anderson advised Planate personnel that they should arm themselves.

Had the shooting incident happened prior to contract award, the government could have taken proper steps to alert offerors of the true risks and the offerors could have included associated costs in their offers. As events turned out, however, the incident happened immediately after contract award.

By a Memorandum dated 01 November 2011, 438th AEW Vice Commander, Col Bryan C. Bartlett made the 438th AEW Command's initial request that six Planate personnel be authorized to "self-arm." There were two follow-up Command requests, first in April 2012 by 438th AEW Commander, BrigGen Ray, and then in August 2012 by 438th AEW Commander, Brig Gen Sherpo. Authorization finally was granted in the form of a Contract Modification, P00012, which authorized the carrying of weapons, but did not provide for a change in contract price to compensate for the same.

On 31 December 2012, Planate submitted its Request for Equitable Adjustment.

In the Contracting Officer's denial of Planate's REA, dated 23 October 2015, the Contracting Officer relied heavily on the wording of Col Bartlett's initial request which used the language "Planate staff are requesting authorization to carry the M9." According to the Contracting Officer, this indicates that the desire or need to carry weapons originated entirely from the contractor and not from the government.

| 3 | 3631 Ransom Place  Alexandria VA 22306 | Tel: (703) 585-1079  Fax : (866) 844-4373 | www.planate.net  chris.decker@planate.net |



First, the Contracting Officer has ignored the heightened security concerns of the 438th AEW as evidenced by (i) 438th AEW Chief of Staff, Col Anderson advice on contract start-up that Planate personnel should arm themselves and (ii)   policy decisions such as the "Two Person" rule. On 14 May 2011, 438th Commander, BrigGen David W. Allvin issued Memorandum establishing a "Two Person" rule. This required that military and civilian support contractor personnel travel at least in twos "… at all times on the Afghan compound with exception to the immediate area surrounding KSPANs 1, 2 & 3." As first implemented, US military personnel were available, as needed, to accompany contractor personnel. Over time, the number of US military personnel continued to decline such that personnel were no longer readily available to accompany the contractor personnel.

Second, the Contracting Officer misconstrues the language in Col Bartlett's request. The statement "Planate staff are requesting authorization to carry the M9" merely addresses the type of weapon involved and not the basic need for arming contractor personnel.

In accordance with Contract Clause 52.225-4, subsection (c), the 438th AEW Command acknowledged an underlying responsibility for the personal security of its embedded contractor support personnel. The deteriorating security situation threatened the Command's successful completion of its mission. Awareness of this responsibility is evident in the rest of the Col Bartlett's memorandum which discusses why it is in the best interest of the government that Planate personnel be armed for protection:

> 1. In moving from living quarters in US/Coalition areas to work locations in AAF controlled areas;
>
> 2. In traveling to forward operating areas as part of their duties when US military security personnel are not available; and
>
> 3. To assist in total team defense in case of attack.

**Constructive Change**
The US understanding of the true nature of the security situation at the contract work locations changed significantly from the period just preceding contract award. The new awareness of a deteriorating state of security raised significant concerns on the government's part about the safety of both its military and its contractor personnel. The security situation threatened the success of the Command's mission. Because the Command did not have sufficient resources to provide for security itself, it sought higher command authorization to authorize contractor self-arming inn accordance with subparagraph (c) of FAR Clause 52.2225-4.

Planate was surprised, therefore, when the contract Modification did not recognize government responsibility, but placed the financial burden on the contractor.

This change in the risk posture, and the contracting officer's failure to acknowledge the same, constitutes a constructive change under the contract.

| 4 | 3631 Ransom Place
Alexandria VA 22306 | Tel: (703) 585-1079
Fax : (866) 844-4373 | www.planate.net
chris.decker@planate.net |



**Mutual Mistake of a Material Fact**

In the alternative, the mis-perception of the true security situation and of the unreliability of the "US Afghan partnership" for personnel security constitutes a mutual mistake of the contracting parties. The true security risks were not understood by the government and, therefore, were not reflected in the solicitation package. The true risks were not conveyed to the offerors, and therefore neither assumed nor reflected in their offers.

The true risks are material to successful performance of this contract. Neither the 438th AEW nor the embedded Planate contractor personnel could properly fulfill their mission without proper security for their personnel as they moved between the US and the Afghan compounds and as they visited remote Afghan controlled locations.

Had these true risks been known and disclosed, Planate could have built appropriate costs in its offer.

This constitutes a mutual mistake of the contracting parties requiring an appropriate reformation of the contract and compensation for Planate.

**Demand for Sum Certain**

Planate seeks reimbursement in the amount of $84,864.85 as further specified in the following table:

| Item | Description | Total |
|---|---|---|
| Weapons | Weapons and shipping charges | $13,294.90 |
| ITAR Support | ITAR, State Dept, & Int'l Licenses | $26,289.95 |
| Planate staff support | Program Manager, Country Manager, coordination | $45,280.00 |
| | Total | $84,864.85 |

# Cost Narrative

### a. Background

Planate utilized actual invoices for service costs incurred to develop the above detailed unit cost totals. We utilized various sources to increase the accuracy of our estimate input information in the development of our cost estimates and to support the validity of the bases of the estimate.

### b. Treatment of Direct vs. Indirect Costs

Planate organizes its chart of accounts in our accounting system so that costs are organized into specific cost pools. There is a cost pool for Direct Costs; separate indirect cost pools for Fringe Benefits, Overhead Costs and General & Administrative Costs; and for Unallowable Costs.



The Direct Costs pool consists only of costs specifically incurred in the performance of contract work. Such costs will be charged directly to final cost objectives.

The Fringe Benefits pool consists of those costs that are incurred as a result of having employees. Fringe Benefits fall into the following categories: compensated absences, group benefits, and payroll taxes. The Fringe Benefits pool of accounts is allocated on the basis of total labor costs. Consequently, Fringe Benefits are proportionately allocated to Direct Labor, Overhead Labor, and General & Administrative Labor.

The Overhead pool consists of those costs incurred to support the performance of contract work, but which cannot be charged to any one single cost objective. Examples of such costs include costs of facilities used in the performance of contract work, project management support, training, and recruitment. Because Overhead supports both the performance of contract work and the development of cost proposals, the Overhead pool is allocated to final cost objectives on the basis of Direct Labor and Bid & Proposal Labor.

The General and Administrative pool consists of costs necessary for the operation and administration of Planate, but have no direct relationship to the performance of contract work. Such costs are administrative in nature. Examples of costs accumulated in the G&A pool include the accounting function, the human resources function, costs of facilities used for administrative purposes, and office supplies.

Planate uses the job cost functionality available within the QuickBooks program to identify and accumulate costs by contract. Each separate final cost objective (contract, contract line item, or task) are established in the Customer Center in QuickBooks. All costs charged to a Direct Cost account in the chart of accounts are assigned to its respective final cost objective as well. To insure that all direct costs are associated with a final cost objective, Planate compares job cost detail with general ledger control totals at least monthly, and reconciles any differences.

Planate has installed ICAT (indirect cost allocation tool) into its QuickBooks program and computes its indirect rates and allocates its indirect costs no less often than monthly. From ICAT a rate calculation report is produced for management evaluation that shows for each indirect cost pool the cost pool detail, the allocation base detail, the indirect rate calculation, and the allocation of the pool contents to each base component. A contract cost report is also produced from ICAT that shows for each final cost objective the direct costs by general ledger account, and the allocated indirect costs from each cost pool.

Each transaction recorded in the books of account is coded as to the proper ledger codes to be charged or credited. Each asset and liability account is reconciled to supporting documentation at the end of each accounting cycle, but no less often than monthly. Job cost detail is reconciled to the corresponding general ledger account at the end of each accounting cycle, but no less often than monthly.



**Table 2. Accounting Treatment of Major Cost Elements**

| Major Cost Element/Pool | Contract Direct Cost | Contract Indirect Cost |
|---|---|---|
| Direct Labor | ✓ | |
| Direct Management and Administrative Labor | ✓ | |
| Direct Materials | ✓ | |
| Facilities, Tools, and ODCs | ✓ | |
| Subcontracts | ✓ | |
| Fringe Benefits | | ✓ |
| Overhead (includes fringe benefits allocated) | | ✓ |
| G&A | | ✓ |

### c. Indirect Costs

Planate is utilizing our audited indirect rates for Overhead and G&A to apply to only estimated labor costs for Mr. Decker and Mr. Larson's estimated costs. These rates have been utilized to adequately recover reasonable indirect costs incurred in support of the subject activities.

i. Overhead Pool

Planate's overhead pool consists of those costs incurred to support the performance of contract work, but which cannot be charged to any one single cost objective. Examples include the cost of facilities used in the performance of contract work, project management support, training, and recruitment. Because overhead supports both the performance of contract work and the development of cost proposals, the overhead pool is allocated to the final cost objectives on the basis of direct labor and bid and proposal labor.

ii. G&A Pool

The *general and administrative pool* (G&A) consists of the costs necessary for the operation and administration of the company, but that have no direct relationship to the performance of contract work. Such costs are administrative in nature. Examples of costs accumulated in the G&A pool include accounting, human resources, facilities used for administrative purposes, and office supplies.

### d. DCAA

DCAA Branch Office POC:
Defense Contract Audit Agency (DCAA)
Springfield Branch Office
5904 Richmond Highway
Alexandria, VA 22303-0411
Cell: (703) 325-9542 / Fax: (703) 325-0411
Dcaa-fao6331@dcaa.mil

Our proposal, bidding methods, and accounting practices have been evaluated, reviewed, and monitored by our company's accounting staff and DCAA.



A DCAA review of Planate's accounting system, completed in February 2012, found our system to be compliant without any adverse observations or findings. Our system was found to be acceptable for successful financial management on all types of government contracts. Our accounting policies and procedures comply with Federal Acquisition Regulation (FAR) cost principles and DCAA provisions regarding internal controls over the accumulation of accounting data and the charging of costs to various contracts.

An additional DCAA audit, dated January 6, 2014, stated that DCAA believes Planate's indirect rate structure accumulates indirect costs in logical groups and allocates the costs based on benefits accrued to intermediate cost objectives. DCAA found that charges were billed in accordance with contract terms and conditions.



## Certification

I, Chris C. Decker, hereby certify that this Claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable; and that I am duly authorized to certify the claim on Planate Management Group LLC's behalf.

_____
Chris C. Decker

**Contract No. W91B4M-11-P-4342**

| Vendor | Date | Amount | REF Page | Comments |
|---|---|---|---|---|
| **Weapons/Shipping Charges** | | | | |
| EWC | 1/16/2012 | $4,694.00 | 2 | Freight to Afghanistan |
| Hurricane Butterfly | 10/3/2012 | $1,000.00 | 3 | |
| Hurricane Butterfly | 10/4/2012 | $4,200.00 | 4 | |
| Hurricane Butterfly | 10/4/2012 | $160.89 | 5 | |
| Hurricane Butterfly | 9/29/2015 | $3,240.01 | 6 | |
| SUBTOTAL | | $13,294.90 | | |
| **ITAR Compliance** | | | | |
| FD Associates | 8/25/2012 | $3,782.00 | 8 | |
| FD Associates | 9/22/2012 | $1,822.50 | 11 | |
| FD Associates | 10/27/2012 | $771.50 | 15 | |
| FD Associates | 12/1/2012 | $76.50 | 17 | |
| FD Associates | 9/20/2014 | $110.00 | 19 | |
| John S. Wittman LLC | 6/13/2012-July 2015 | $5,600.00 | 21 | |
| Greenberg Traurig | 1/7/2015 | $4,378.50 | 22 | |
| Greenberg Traurig | 2/4/2015 | $1,336.00 | 27 | |
| Greenberg Traurig | 4/4/2015 | $1,375.00 | 35 | |
| Greenberg Traurig | 5/5/2015 | $2,754.00 | 39 | |
| Greenberg Traurig | 6/4/2015 | $2,016.45 | 46 | |
| Greenberg Traurig | 8/10/2015 | $2,267.50 | 50 | |
| SUBTOTAL | | $26,289.95 | | |
| **Program Management, Administration, and Overall Coordination** | | | | |
| Kent Hedges | 6/13/2011 - 5/28/2015 | $12,180.00 | | Estimated 174 Hours per Kent Hedges |
| Jonathan Larson | 6/13/2011 - 5/28/2015 | $14,250.00 | | Estimated 150 Hours per Chris Decker |
| Chris Decker | 6/13/2011 - 5/28/2015 | $14,250.00 | | Estimated 150 Hours per Jonathan Larson |
| Rick Ward | 2/23/2013 | $1,000.00 | 58 | Weapons Policy for AAF |
| Jack Nafpilotis | 5/15/2013 | $1,800.00 | 59 | Security/Weapons plan review and re-certification |
| Jack Nafpilotis | 6/15/2013 | $1,800.00 | 61 | Security/Weapons plan review and re-certification |
| SUBTOTAL | | $45,280.00 | | |
| SUBTOTAL | | $84,864.85 | | |
| GRAND TOTAL | | $84,864.85 | | |